UNITED STATES DISTRICT COURT
NORTHERN DISTRICT COURT OF NEW YORK_____

MARILYN SMITH,

                                        Plaintiff,

                                                          **CIVIL COMPLAINT**


        -against-                              **Civil Case No.:**  8:17-CV-1149[GTS/CFH]

NEW YORK STATE DEPARTMENT
OF CORRECTIONS AND COMMUNITY SUPERVISION,

                                        Defendant.

———————————————————————————

**JURY TRIAL DEMANDED**

**PRELIMINARY STATEMENT**

1. Plaintiff, Marilyn Smith, brings this action under the Americans With Disabilities Act, 42 U.S.C. §§12101, 12117 and the New York Human Rights Law ("NYHRL"), N.Y. Exec. Law § 290 et seq. for employment discrimination based on a Disability. The Plaintiff alleges that Defendant The State of New York Department of Corrections and Community Supervision (Hereinafter referred to as DOCCS), New York State Department of Civil Service, and New York State Department of Employee Health Services (Hereinafter referred to as EHS) through its employees and agents did discriminate against her based on a Disability by failing to provide her a reasonable accommodation, by treating her in disparate manner based on her disability and retaliating against her for requesting an accommodation.  The Plaintiff is now seeking compensatory damages, punitive damages, costs and attorney's fees for the Defendants wrongful conduct.

## JURISDICTION

2.  This Court has jurisdiction pursuant to 28 U.S.C. §§1331 and 1343. Plaintiff's claims are brought under the Americans With Disabilities Act, 42 U.S.C. §§12101, 12117.  Supplemental jurisdiction exists under the New York Human Rights Law, Executive Law §§292 and 296 et seq.

## VENUE

3.  This action properly lies in the Northern District of New York, pursuant to 29 U.S.C. § 1391(b), because the claim arose in this judicial district, and pursuant to 42 U.S.C. § 2000e-5(f)(3), because the unlawful employment practice was committed in this judicial district.

4.  On July 12, 2017 the EEOC issued a "right to sue" letters, authorizing plaintiff to commence an action against Defendants within 90 days from receipt of the same.  A copy of the right to sue letter is annexed hereto as Exhibit A.

5.  This action is commenced within 90 days of plaintiff's receipt of the right to sue letter.

## PARTIES

6.  Plaintiff, Marilyn Smith, is a citizen and resident of the United States, State of New York, Clinton County residing in the City of Plattsburgh.

7.  Defendants, New York State Department of Corrections and Community Supervision (herein after "DOCCS or Defendant interchangeably.

## FACTS

8.  The plaintiff was hired by Defendant DOCCS as a Social Worker II on August 2007.

9.  Sometime in 2012 the Plaintiff was diagnosed with an Acoustic Neuroma, a non-cancerous fibrous tumor located deep inside the skull and are adjacent to vital brain centers in the brainstem.  As these tumors grow, they affect surrounding structures in the brain that control vital functions.  The most common symptoms are hearing loss, tinnitus, balance problems, unsteadiness, dizziness, and facial numbness.

10. In January 2013, Plaintiff travelled to the renowned House Ear Clinic in Los Angeles to undergo middle fossa surgery to remove the tumor.

11. As a result of the tumor and the surgery to remove the tumor, Plaintiff has a brain injury with cognitive and physical symptoms and deficits, total left side hearing loss, loss due to the severing of her left side balance nerve, headaches and facial pain due to trigeminal neuralgia.

12. On information and belief, the disabilities identified above in Paragraph 11 are disabilities as defined by the Americans with Disability Act of 1990. and by New York State Human Rights Law because they impaired the following major life activities for the Plaintiff: working, hearing, sleeping, walking, standing, speaking, learning, reading concentrating, thinking, and communicating.

13. The Plaintiff was receiving medical treatment and provided Defendant medical documentation in support of the impairments in Paragraph 12.

14. On April 8th 2013 the Defendant was notified of Plaintiffs disability and need for an accommodation when Head of Personnel Clerk Jill Besaw received a NYS Estimated Physical Capabilities Form signed by Plaintiffs doctor dated April 5, 2013.

15. Paragraph 5 of the NYS Estimated Physical Capabilities Form requested whether or not the employee had a visual or hearing impairment requiring accommodation to which the Plaintiffs

Doctor marked yes and explained that the disability that required an accommodation was a loss of hearing in the left ear.

16. Defendant never engaged in the interactive process and never provided Plaintiff with reasonable accommodations.

17. That the Plaintiff's disabilities are covered under the Americans with Disabilities Act (ADA) and New York State Human Rights Law (NYHRL).

18. Defendant never returned Plaintiff to the same or substantially similar duties since her return from FMLA. Instead of returning to her the duties she held since 2007, Plaintiff was assigned two additional Sex Offender Counseling and Treatment programs upon her return from FMLA. Since 2007, Plaintiff was never assigned the additional workload, additional duties and never worked at the Clinton Annex before given the additional assignment after her return from FMLA.  The new additional duties also required Plaintiff to work at a second location, Clinton Annex. Defendant assigned Plaintiff additional duties despite the fact they are the duties that have been always filled by an Offender Rehabilitation Counselor (hereinafter referred to as ORC). Defendant did not require Plaintiff to fill the duties of an ORC due to a hardship; prior to and after Defendant's order there were ORCs at Clinton Main and Clinton Annex were available and previously trained by the Sex Offender Counseling and Treatment Program Specialists from DOCCS Central Office in Albany, New York to conduct the exact program they assigned to Plaintiff. All the ORCs assigned to Clinton Annex were trained with the intent of having trained staff at Clinton Annex to step in and cover if necessary.  Instead of utilizing this available remedy, Defendant assigned additional duties to the Plaintiff who had just returned from FMLA.

19. Defendant had reason to know of Plaintiff's serious medical condition when she explained to her supervisor she would have difficulty keeping up with the additional work load and she

requested her supervisor provide her with the reasonable accommodation of allowing her to work with the inmates currently assigned to SOCTP at Clinton Annex and stopping any the transfer of any additional inmates to Clinton Annex while I cover the ORC Position. Defendant confirmed I would only work with the inmates currently at Clinton Annex. Defendant did not honor or implement Plaintiff's request for reasonable accommodation. A continual flow of inmates transferring to attend SOCTP at Clinton Annex caused Plaintiff's workload and caseload to steadily increase.

20. Defendant had reason to know of Plaintiff's serious medical condition when she explained to her supervisor at Clinton Main she would have difficulty keeping up with the additional work load and she requested her supervisor provide her with the reasonable accommodation of time to do the necessary interviews, assessments evaluations and paperwork that is required when setting up a new program and preparing for a new group. Instead of engaging in the interactive process and giving Plaintiff's request the reasonable accommodation of time any consideration, the Defendant responded to Plaintiff's request for assistance and reasonable accommodations by immediately entering the inmates into the DOCCS system as active SOCTP Participants. Defendant refused to provide Plaintiff with the reasonable accommodation of time and intentionally and maliciously added to my stressors and workplace difficulties by creating stringent time constraints when he "started the clock running" by officially listing the inmates as active SOCTP participants in a closely scrutinized six month program without informing me of his actions or giving me any time to prepare.

21. In an attempt to keep up with the additional duties, Plaintiff worked many hours beyond her assigned shift without receiving any compensation for the additional hours she worked. Defendant knew and acknowledged Plaintiff was working additional hours beyond her

assigned shift and reminded Plaintiff she will not receive any compensation for the additional time she is putting in.

22.  In June, July, August, and September, 2013, despite Plaintiff's best efforts, she was unable to perform her duties as she had prior to surgery, and the assignment of additional workloads further compounded the problem. She could not work at the same pace, and it took tremendous time and effort to produce quality written work while covering her additional assigned duties. She was unable to keep up with her paperwork, she had difficulties with fatigue, timeliness, ability to focus, managing and she had an especially difficult time keeping track of and preparing for multiple programs.

23. During this time, Plaintiff spoke her supervisors, Program Specialist Darcy Wills, Senior Offender Rehabilitation Counselor Peter Frederick, Deputy Superintendent of Programs Proulx, Assistant Deputy Superintendent of Programs Gordon and EAP about the situation. She made multiple requests for assistance in the form of reasonable accommodations and she requested numerous times to be relieved of the Annex Program.  All the supervisors she spoke with knew or had reason to know I had recently returned from FMLA, and she repeatedly advised her supervisors she was experiencing workplace difficulties keeping up with her work and the timely completion of her work.

24. Since her surgery in January 2013, Plaintiff cannot take many medications due to their effect on her gait and balance.  She cannot take antihistamines, and as a result simple colds have developed into significant ear and sinus infections. On one occasion when she was speaking with supervisor Program Specialist Darcy Wills, she was quite ill with a sinus infection.  She had laryngitis and barely had a voice.  She told her supervisor she wasn't doing well and she could manage the additional assigned duties.  He responded by threatening that if Plaintiff continues to complain, he will restructure my program to further increase the number of

inmates in my assigned program. "I can put in a change and give you 20 inmates and you would have to run group with 20. How would you like that?"

25. The actions and inactions of Plaintiff's supervisors resulted in difficulties with her coworkers. Coworkers believe Plaintiff was lazy and slow. She was experiencing workplace problems with staff she regularly interacted with and staff I did not even know. This would include name calling, ridicule, mocking, put downs, unjust scrutiny interference with my work performance, and isolation. Plaintiff endured this on a daily basis. Staff referred to Plaintiff as the Black Widow, one staff member openly stated she hoped an inmate she knew who had a history of with multiple lewd exposures and just transferred into my program at the Annex would do the same thing to Plaintiff, her vehicle would get blocked by other vehicles in the Clinton Annex parking lot, staff would block access to her desk, SOCTP staff would openly discuss how I was lazy and unable to complete my work. Employees would openly speak disparagingly about me and question, ridicule, and mock an employee who showed me any courtesy, consideration, or take issue with what they were saying about me. It became so difficult to endure Plaintiff would regularly call her husband, a friend, or go to EAP for support before I went into the Prison in the morning. While this was occurring, Plaintiff informed her supervisors of the difficulties she was experiencing from other employees.

26. Defendant originally informed Plaintiff that her assigned duties at Clinton Annex was to temporarily cover for an ORC on sick leave. The additional duties extended when the ORC resigned from her position. Defendant knew Plaintiff was having difficulties with the extra assigned duties, but made no effort to fill the vacant ORC position or utilize an available remedy by replacing her with a trained ORC already assigned to Clinton Annex.

27. In September 2013 Assistant Deputy Superintendent of Programs Hartford assigned to Clinton Annex informed Plaintiff in a meeting in ADSP Gordon's Office he was reviewing her

schedule and speaking with Program Specialist Darcy Wills in Albany about making the ORC Position at Clinton Annex my permanent assignment. A week prior to speaking with me, ADSP Harford made this announcement to the SOCPT Treatment Team at the Annex in a Friday Staff Meeting.

28. Plaintiff repeatedly requested to be relieved of her assignment at Clinton Annex citing health issues, but no action was taken to provide Plaintiff the assistance she requested. Her requests for help from my supervisors were ignored and Plaintiff's the problems in the workplace and with coworkers became increasingly worse.  Plaintiff's health and my cognitive ability had steadily declined since her return to work after FMLA.

29. Plaintiff told supervisors at Clinton Main and Clinton Annex she was having problems, and she told her Supervisor at Clinton Main she could not continue. On September 20, 2013, Plaintiff stopped going to Clinton Annex. The situation had become so bad Plaintiff was forced to put myself at risk for potential disciplinary action in order to help herself. Annex Staff and Supervisors saw my actions as defiant and lazy. Staff and supervisors discussed my departure at the next treatment team meeting and they said "Who does she think she is telling supervisors what she will and will not do?  She needs to do what she is told."

30. In September 2013 Plaintiff's Supervisor, DSP Proulx, saw her working late.  He knew Plaintiff was staying late and putting in extra hours without overtime.  He stopped at her desk and asked Plaintiff "Why are you always here?"  Plaintiff explained to her supervisor she has been unable to get her work done, she is having difficulty managing her additional duties, and that is why she has to stay late. She informed her supervisor she is having a difficult time staying focused and she stays late because it's quieter and she can concentrate without distractions. She told him she is not doing well and something isn't right since return from FMLA and she has not made any progress with her recovery.  She told him she has not been

able to accomplish what she used to be able to accomplish before she went out on sick leave and is seeing her physician to find out what is wrong.  DSP Proulx attempted to empathize and explained he also has had difficulties over the past few years.  Plaintiff clarified the issues she is experiencing are related to her surgery and her my recovery.

31. Nothing occurred after made this disclosure to my supervisor. Once a supervisor is provided such a disclosure, the supervisor has an obligation to initiate a discussion about reasonable accommodations.  This never occurred. Instead Plaintiff's supervisors watched her struggle knowing her health was suffering, she was overwhelmed and she regularly worked late without overtime in an attempt to remedy the situation on her own.

32. Instead of returning Plaintiff to the same or essentially similar duties upon her return from FMLA, the Defendant ignored her heath issues and requests for assistance.  Defendant increased Plaintiff's workload upon her return from FMLA and then held her accountable for failing to meet expectations and being unable to complete the additional duties of the increased workload.

33. In October, 2013 Plaintiff's Supervisor Program Specialist Darcy Wills knowing Plaintiff had been out on sick leave and was having difficulties keeping up with her additional caseload contacts Plaintiff to censure her for running a high risk SOCTP program longer than 18 months., Plaintiff reminded her supervisor there was a break in group because she was out on FMLA, but he responds "that isn't enough."  According to his calculations that when factoring in my FMLA, the group is approximately 21 days over 18 months. Plaintiff  informs her supervisor she is not doing well, and she is doing her best to keep up.  Plaintiff's supervisor confirms his request was not triggered by an inmate complaint, there is no pressing issue, and there are no adverse effect of the delay. Plaintiff's supervisor maintains it his duty to ensure I adhere to the time limits imposed on SOCTP, and he refuses to give her health or her situation

any consideration. Plaintiff's supervisor orders Plaintiff to submit a memo requesting an extension with an explanation as to why she is unable to adhere to the rule.

34. Plaintiff has worked in Sex Offender Counseling and Treatment Program as a social worker since the inception of the program in 2007.  She never before received an order to submit such a memorandum until she was subject to this unjust scrutiny of my work.

35. Plaintiff spoke with other SOCTP social workers, they all confirmed they have worked with participants who have exceeded 18 months, and they further confirmed they were never questioned about the delay or required to submit a memorandum to SOCTP Central Office in Albany explaining why they were unable to adhere to the rule.

36. On November 1, 2013 SOCTP Program Director Darcy Wills, knowing the nature of my work, the litigiousness of our population, and the fact that SOCTP files are subject to vast dissemination, maliciously directs the memorandum he ordered me to submit that contained my health information be placed in the files of five inmate files. Darcy Wills emails directs a copy of the memo be placed in each offender's SOCTP file "with the necessary redactions of other inmates and staff personal information"  SORC Frederick only redacts the names of the inmates and then places a copy of Darcy Will's email and my memorandum with my personal health information in the SOCTP files of five inmates.

Darcy Wills and SORC Peter Frederick had a responsibility to restrict an employee's personal information and to prevent unauthorized access.

37. There is no legitimate, non-discriminatory, or non-retaliatory reason for the actions taken by Plaintiff's supervisors.  None of the information contained in the memo I was ordered to submit pertained directly to the five inmates. No official need or benefit was served by the inclusion of the memo in the inmates' SOCTP files, and no harm or detriment resulted after I removed the memorandum from the inmates' files on August 15, 2014. In this situation, a simple

chronological entry in each of the inmates' files explaining the extension without any of my personal information was able to suffice.

38. On November 21, 2013 Plaintiff speaks with Chief Clerk, Jill Besaw in Personnel about the problems she is having at work and my physical and cognitive problems.

39. In December 2013 Plaintiff receives a telephone call from her supervisor, SORC Frederick. He advises Plaintiff she needs to complete her current group and begin a new group the following week. She explains to him that she is having a problem completing her work and she is seeing a doctor to see what can be done. She also told him she is still having difficulty keeping up with the two programs. In the same conversation, Plaintiff asks her supervisor for the reasonable accommodation of time to complete and closeout the current group and she will also need time to do set do interviews, complete assessments, and do all the paperwork that is necessary to set up the files for the new group.

40. Plaintiff's Supervisor, SORC Frederick and ignores Plaintiff's request for the reasonable accommodation of time. He responds to her request by again using the NYS DOCCS Mainframe computer system to retaliate against Plaintiff. SORC Frederick falsely enters information into the statewide computer system indicating the inmates completed their sex offender treatment on December 29, 2013, when they actually completed on January 8, 2014. SORC Frederick's actions created an official record the inmates completed treatment and portraying to Plaintiff's Regional Supervisor, Program Specialist Darcy Wills, that she was only running a low risk program with five inmates.

41. On January 8, 2014, immediately after Plaintiff informs SORC Frederick the inmates have completed group, SORC Frederick disregards his last conversation with Plaintiff and ignores her request for the reasonable accommodation of time. SORC Frederick continued to use his supervisory role to intentionally cause Plaintiff harm. He forwards Plaintiff an email from

Program Specialist Darcy Wills in Albany informing Plaintiff, "Unless you have some strong reason why this group of individuals can't start on Tuesday, the 21st of January, I will be programming them into the items as reflected below on Thursday. We need to have more in attendance than five offenders".

42.  Once again, Peter Frederick used the state wide computer system to "start the clock" by adding new inmates by entering them into the statewide computer system as active participants in SOCTP on January 16, 2014. With the holiday and time off I needed for medical appointments, Peter Frederick gave me less than 3 days to complete final assessments, prepare discharge summaries as part of the necessary paperwork to close out the 8 inmates who just completed program and interview, complete an assessment and complete all the necessary paperwork to prepare for the participants who would be starting SOCTP. After being informing him I was not doing well, I am having difficulty with my extra duties, I am falling behind in my work since my return from medical leave, and requesting the accommodation of additional time my Peter Frederick intentionally and maliciously discriminated, harassed and retaliated against me by creating was a situation that placed unnecessary and unreasonable time constraints on me knowing it would cause me to fall even further behind

43.  On January 16, 2014 Plaintiff speaks to DSP Proulx.  She again informs him of the problems she was experiencing with her supervisors SORC Frederick and Program Specialist Darcy Wills and informed DSP Proulx she had an appointment with a specialist in Philadelphia on Monday, January 20, 2014.

44. At 12:07pm on January 20, 2014, after Plaintiff's appointment she sent an email to Head Personnel Clerk at Clinton CF, Jill Besaw to advise her the doctor has referred me out for a bunch of tests and will be putting me on light duty until all the testing is complete. I ask Ms. Besaw what documentation will be needed for light duty.

45. On January 21, 2014  Plaintiff speaks with DSP Proulx and informs him them she is being placed on light duty until her test results are complete.

46. In March 2014 Plaintiff meets with Dr. Kelly Heath at the University of Pennsylvania.  Dr. Heath is a physiatrist who specializes in physical medication and rehabilitation. Dr. Heath has clinical expertise and provides comprehensive care for neurological disorders. Dr. Heath explains her goal in treatment is to optimize patients return after neurologic injuries, including acquired and traumatic brain injury.  Plaintiff informs Dr. Heath her treatment priority is a successful return to the workplace so she can work until she reaches my projected retirement date in 2019.  Dr. Heath recommends an intensive episode of outpatient treatment with Penn Medicine rehabilitation providers who also specialize in neurological disorders. To safeguard against any further decline, Dr. Heath recommends Plaintiff remain on light duty until she starts rehabilitation treatment.

47. In March 2014 Plaintiff informs Head Personnel Clerk, Jill Besaw, she need to leave for medical treatment, and she provides me the Documentation for Personal Sick Leave to be completed by Dr. Heath.  Although Plaintiff is eligible for FMLA, Ms. Besaw advises me that FMLA documentation is not needed in this situation. I am advised that although the form I am given is usually accepted for 30 day medical leaves, the form will be accepted for my medical leave.

48. In late March and early April 2014 Plaintiff informed her supervisor, DSP Proulx  she needs to go out on a second medical leave to work on her recovery from surgery and she will require and request reasonable accommodations when she returns from her medical leave.

49. From February through May 8, 2014 Plaintiff is assigned to the same program area where she previously had difficulties with hearing, anxiety and concentration. Due to her loss of hearing on one side being assigned to work in a large open room full of people with lots of traffic, it is

impossible for her to ascertain who is speaking, if someone is speaking to her, and which direction to respond to when someone calls out her name. As a result, she is isolated during her light duty and her interactions are limited to her communications with supervisors SORC Peter Frederick, Program Specialist Darcy Wills, DSP Proulx, and ADSP Gordon as she prepares to go out for medical leave. During this time her supervisors continue to single her out and treat me more harshly than my coworkers. Darcy Wills and SORC Peter Frederick mischaracterize and misrepresent her work, accuse me of wrongdoing, portray her as an obstinate, uncooperative troublemaker to their higher level supervisors thereby further undermining my reputation and credibility with my higher level supervisors at Clinton CF and DOCCS Central Office. Plaintiff did not have the power or ability to avoid, improve, or change her situation, and she continually informed and sought help from DSP Proulx and ADSP Gordon as it was the only remedy available to her.

50. On May 7, 2014, the day before Plaintiff was scheduled to begin her medical leave at the direction of Program Specialist Darcy Wills, SORC Peter Frederick submitted an Application to Establish a New Program in SOCTP to DSP Proulx for review and signature. At the top of his application Peter Fredrick noted the application was resubmitted "due to original not on file." However, it was not a resubmission; Darcy Wills and Peter Frederick knew the "original" Program Proposal they claimed they could not locate did not exist. The application falsely states it is a resubmission "due to original not on file," when in fact, an original never existed. SOCTP was developed and put into operation by DOCCS Central Office. The facilities chosen to run SOCTP and the specific programs assigned to each facility were solely the decision of DOCCS Central Office; an Application to Establish a New Program was never needed or submitted. Plaintiff's supervisors maliciously and deliberately sought to add a second program to an already understaffed program and they intentionally provided false and misleading

information to hasten the approval of their application and circumvent any scrutiny. Beginning with DSP Proulx, every supervisor who approved the application had the obligation to know what they were signing. The supervisors should have discovered or been advised the application was deceptive, contained considerable discrepancies, significant and tangible changes in my employment would result by adding a second program without adequate staff or a plan to implement same, and their approval of the application would create difficulties for me based upon my disability. Either DSP Proulx and the subsequent supervisors approved the application fully aware of SORC Frederick and Program Specialist Darcy Wills' purpose and intent to use their approval to further harass, retaliate, and discriminate against me or they failed to properly review the application submitted by Peter Frederick at the direction of Darcy Wills before summarily signing their approval.

51. Knowing Plaintiff ran the high risk SOCTP at Clinton Main APPU without an ORC for over 3 years in accordance with their direction, and after informing Plaintiff the SOCTP ORC item is being utilized elsewhere and will never be filled again. SORC Frederick submits an application at the direction of Program Specialist Darcy Wills with the complete falsehood that 2 staff, an ORC and a Social Worker, will be assigned to the revised SOCTP in APPU. They failed to truthfully disclose that the current and any additional SOCTP programs in APPU will all be run with only one staff member. Despite the obligation of the Defendant to ensure their approval of this application would not create any workplace obstacles or difficulties for me based upon my disability, the issue was never addressed and the application was summarily approved.

52. On July 29, 2014 Plaintiff forwards a letter from my physician that included a request for reasonable accommodations.

53.  Plaintiff returns to work on August 11, 2014 and fills out DOCCS form 2607 as instructed to request reasonable accommodations. Plaintiff worked very hard in treatment with the goal of successfully transitioning back to work and she walked in very optimistic on her first day back. She believed the financial sacrifice and tremendous effort I put into my recovery was about to pay off, all she needed at this point to achieve her treatment goal of a successful return to work was my reasonable accommodations. DSP Proulx quickly shifted the focus our meeting to the site visit by Program Specialist Darcy Wills and SOCTP Coordinator Shelly Mallozzi and the poor review of my work while I was on medical leave.  He states he cannot understand why Plaintiff failed to do her job, when others have greater work responsibilities than me and they can get their work done.  Plaintiff reminded him of the problems she had as soon she returned from sick leave due to my disability, the extra duties she was given, and how the treatment she received from Program Specialist Darcy Wills and SORC Peter Frederick compounded the problem.  Plaintiff reminded DSP Proulx and ADSP Gordon how they would always see her working late.  She told them she was humiliated and ashamed that she could not complete her work then, and she feels humiliated and ashamed discussing it now. In response to Plaintiff's request for reasonable accommodations, she had to sit and listen to my supervisors speak so negatively about her, question her ability, and doubt her work ethic.  Plaintiff's supervisors did not engage in the interactive process, she was made to feel humiliated and incompetent, and there has been no further discussion regarding reasonable accommodations with her supervisors at Clinton Correctional Facility to date.

54. On September 12, 2014, DSP Proulx and ADSP Gordon provide Plaintiff a written response to Plaintiff's request for reasonable accommodations.

55. On September 17, 2014 Plaintiff provides DSP Proulx a memo regarding the response she received to her request for reasonable accommodations.  Plaintiff notes the response provided

does not provide any tangible accommodations.  Plaintiff never received any further response from DSP Proulx.

56. On September 22, 2014, writer speaks to LaShanna Frasier of DOCCS Office of Diversity Management (ODM) and explains she has not received any of the reasonable accommodations in DSP Proulx's September 11, 2014 response.

57. After receiving no response from Clinton CF or ODM, on November 19, 2014, Plaintiff makes an appointment to meet with LaShanna Frasier of ODM in Albany New York.  Ms. Frasier advised Plaintiff she will bring this matter to the attention of her supervisor for assistance and direction.

58. On December 15, 2014, in a meeting with DSP Proulx, ADSP Gordon, and SORC Frederick, DSP Proulx agrees to reinstate Plaintiff to the same position she had prior to FMLA Leave. Plaintiff is informed that although her requested accommodations are not in place she will need to prepare for program and start running a program without her requested reasonable accommodations.

59. January 5, 2015, was supposed to be the day Plaintiff was reinstated to the same job duties she held prior to her FMLA leave.  Plaintiff was never reinstated because the day she was supposed to return to her duties she received an email form Program Specialist Darcy Wills ordering her to take on the duties of two different positions in two different programs. DOCCS is directing Plaintiff to the exact position and duties that led to her health and workplace problems that required a second medical leave.

60. On January 15, 2015, Plaintiff submits an additional request for reasonable accommodations to the Office of Diversity Management. Plaintiff requests "

***3. I am requesting the reasonable accommodation of being allowed to fulfill the tests and objectives of my duties and adhere to the performance standards of only my own position as an LMCWII in SOCTP APPU with the reasonable accommodations previously requested.***

*5.   I request the reasonable accommodation of being provided direction, detail or instruction from my supervisors in writing.*

*6. I request the reasonable accommodation of receiving a timely written response from my supervisors in response to my requests for confirmation, direction or clarification in writing.*

61. On January 27, 2015 Plaintiff first learns a program and proposal was submitted and approved the day before she went out on medical leave in May 2014.SORC Peter Frederick and ADSP Gordon lie at first and inform the Plaintiff change was made when she was out on medical leave.

62. On January 27, 2015, Plaintiff contacts ODM via email to advise her situation at work had become worse because rather than provide an accommodation the Defendant increased workload.

63. On information and belief ODM took no action in response to plaintiff's email.

64. On January 30, 2015, Plaintiff wrote to DSP Proulx and ADSP Gordon requesting their assistance. In the letter she advised them in form or substance that she believed that Specialist Wills and SORC Frederick intentionally increased her workload (which included work assignments outside of her class title description) knowing of her disability and the impacts the increased workload would have on her disability.

65. On February 6, 2015 ADSP Gordon sends Plaintiff an email in response to her memo. In the email, he informs Plaintiff that she is being assigned a schedule that will have her run two programs alone and permanently assigns Plaintiff to also fill the duties of an ORC in both programs.

66. On February 10, 2015 Plaintiff provides DOCCS Office of Diversity Management medical documentation from her physician in support of Plaintiff's need for reasonable accommodations and also provides ODM with a 36 page guide from the

Mayo Clinic Entitled **Understanding Brain Injury A Guide for Employers**. DOCCS gives no consideration and fails to appropriately respond to the Letters from Plaintiff's Physician.

67. The three page letter from Plaintiff's physician provided Defendant detailed information in response to a request made by ODM requesting additional information to support the requested reasonable accommodations. Additionally this doctors letter advised DOCCS that the "recently mandated" "additional workload duties of vacant staff" and the "second short term program" would be ; detrimental to the Plaintiffs health.  The letter on to request that the Defendant provide the reasonable accommodation of not increasing the plaintiff case load. The Doctor indicated that he had never before had to request as an accommodation that a patient's work load not be increased.

68. On February 17, 2015, DOCCS Office of Diversity Management informed Plaintiff medical documentation conforms with Directive 2607 that outlines the process for DOCCS and Employees when requesting reasonable accommodations.

69. On April 13, 2015  Plaintiff receives a telephone call from ODM advising they have settled her reasonable accommodations, and that her request to be reinstated to her  preexisting duties prior to her FMLA leave has been denied. ODM ignores their duty under FMLA and states she will not be provided this reasonable accommodation because it is an essential function. When Plaintiff questions how duties that are not in her job description, duties she has never been previously

assigned and are in fact are duties of another job description are her essential functions, ODM replies to Plaintiff: "*If a DC states it's an essential function, it's an essential function.*"

70. On May 5, 2015, Plaintiff receives a letter from Nicole Keith, Acting Director of Office of Diversity Management.  The letter acknowledges Plaintiff's request is deemed to be a request for a reasonable accommodation in accordance with DOCCS Directive #2607, the Americans with Disabilities Act (ADA) and the New York Human Rights Law.  Defendant responds to two of Plaintiff's requests for reasonable accommodations.  DOCCS denies Plaintiff's request to return to the to the duties and performance standards of the position she has held from 2007 until she left for FMLA in 2013.  Stating "*Your request, if granted, would limit yhour ability to perform the essential duties of your job.*"

71. On May 18, 2015 DSP McIntosh orders Plaintiff to run her program another program. From the May 18, 2015 meeting:

*Plaintiff:  I know you did not start at the beginning, and I understand you were not here for all of this.  I'm letting you know and I'm trying to explain that this has happened to me before and I cannot do this.*

*DSP McIntosh:  Yes you can.  You will do it.  You are being ordered to do this.  You are smart and you are capable and you can do this.  You are not being told to do something you cannot do.  It is only 8 inmates.*

*Plaintiff:  I know it's 8 inmates.  It's not about the number of inmates, I could do one program with more inmates.  Its never been about the number of inmates.  It's about me bouncing around and all back and forth.  That's what I cannot do.*

*DSP McIntosh:  Yes you can*

*Plaintiff: Knowing what I've been through, I don't know how to do this.  I will follow the order that has been given to me but I can't knowingly come up with a schedule that will make me sick.*

*DSP McIntosh:  Oh, yes you will.  They have looked into everything and there is no indication of that, none…so you will be doing it.  The decision has been made and we are moving forward.*

*DSP McIntosh:  Also, Your evaluations, tasks and duties will be updated.  Pete and I will be going over them and we will let you know what they will be.*

*Plaintiff:  My job description changed?*

*DSP McIntosh:  No you are still a licensed master social worker.  Your description for your job title has not changed.  Your tasks and objectives are going to change and I'm going to go over them with Pete…*

*Plaintiff:  Doing this, doing what you are ordering me to do here, it is going to make me sick, I know this because that's exactly what happened before.*

*DSP McIntosh:  They've looked at everything and determined there is absolutely no indication of that.  The decision has been made and we are moving forward.  There is nothing more to discuss.*

72. On May 18, 2015 Plaintiff speaks with Jason Parrish, and advises him that she is not in agreement with the denial of her request for reasonable accommodations and that she is still awaiting for a response to her the request for an accommodation  submitted on August11, 2014.

73. On May 28, 2015 Plaintiff presented an Estimated Physical Capabilities Form and a cover letter from her physician to the  Personnel department.  She was then instructed by the Head Clerk in Personnel, Jill Besaw, that she needed to take the documentation to Time and Attendance Lieutenant for approval.  The Time and Attendance Lieutenant approved the form, attached a routing slip to the form and gave it back to the Plaintiff. The Plaintiff brought this time slip back to Jill Besaw who told her she to go home and wait further instruction.

74. On May 29, 2015 the Plaintiff sent Jill Besaw an email asking her when the Plaintiff would allowed to return to work. Jill Besaw replied  in form or substance that they had received it and as of "late yesterday I know that Dep. McIntosh had the form and was trying to determine if they are able to provide a light duty assignment.  She is off today and Monday, so I wouldn't anticipate hearing before Tuesday."

75. On June 3, 2015 the Plaintiff received a letter from Head Clerk Jill Besaw stating the following:

"*The reason for your denial your Estimated Physical Capabilities form indicates a restriction upon your return to full duty.  Your return to full duty must be within 60 days and without restrictions*".

76. On June 26, 2015 Plaintiff forwarded Jill Besaw an updated Estimated Physical Capabilities Form completed by her  Physician via email.

77. On July 7, 2015 Jill Besaw emailed Plaintiff stating she needs medical documentation from 06-27-2015 to date or else Plaintiff will need to return to full duty.

78.  On July 14, 2015 Plaintiff resent Jill Besaw an updated Estimated Physical Capabilities Form.

79. On August 18, 2015 Plaintiff received a voicemail from ADSP Gordon advising her that she needs to show up to work the next day on full duty or provide medical documentation from her physician.

80. On September 2, 2015 Plaintiff received a letter from DSA Keysor which stated as follows:

"*Due to the fact that conforming medical documentation has not been received you are considered to be on unauthorized leave of absence (AWOL) status from July 27, 2015 to the present time.  Please be advised that any leave without pay periods may affect your health insurance benefits which include dental and vision benefits.*

81. On September 9, 2015, Plaintiff sent a letter to DSA Keysor requesting that while she sought a return to work that DOCCS to provide her additional leave as a reasonable accommodation under the ADA rather than declaring me AWOL.

82. On September 14, 2015 Plaintiff received a letter from Superintendent Kirkpatrick dated August 8, 2015 informing stating:

"*This is to advise you that effective immediately, I am revoking your authorization for outside employment until further notice. Your work performance, time and attendance is far below departmental minimum requirements*."

83. On September 15, Plaintiff sent her response to Defendant's letter. Plaintiff provided Defendant a response the next day. Plaintiff wanted to ensure Defendant was in receipt of her reply before she was scheduled to return to work at her part time job in order to provide Defendant with an opportunity to communicate with her about the concerns noted and request for clarification contained in the 5 page letter she sent to Superintendent Kirkpatrick.

84. On September 18, 2015, DSP Donita McIntosh called and spoke with Plaintiff's husband. DSP McIntosh asks Plaintiff's husband to give plaintiff the message that she was told to Order Plaintiff to appear at Clinton Correctional Facility on Monday, September 21, 2015 at 8am.

85. On September 18, 2015, Plaintiff spoke with her Regional Union Representative, Martin Blair. Mr. Blair informs Plaintiff that when Plaintiff appears at Clinton CF on Monday, she will be served with charges and suspended. Mr. Blair informs Plaintiff "they have been tailing you," and DOCCS placed her under surveillance and investigation by DOCCS Office of Special Investigations.

86. On September 21, 2015, Plaintiff was unable to appear as ordered. Plaintiff experienced a significant increase in symptoms, which required Plaintiff to

seek treatment and testing in the Emergency Room at the University of Vermont Hospital in Burlington, Vermont.

87. On September 29, 2015, Plaintiff sent updated Estimated Capabilities Form and Email to DSA Keysor requesting she be allowed to return to work and again requested light duty as a reasonable accommodation.

88. On September 29, 2015, Martin Blair of PEF informed Plaintiff DOCCS is seeking disciplinary charges for continuing to work her part time job, and DOCCS is ordering her to appear in Albany, New York for an interrogation.

89. On October 5, 2015, Plaintiff completes Form 2607 and attach the October 1, 2015 letter she originally sent requesting Defendant provide Plaintiff with Reasonable Accommodations for the interrogation. Plaintiff forwards the request and letter to Stephen J. Maher, Office of Special Investigations; DSA Keysor/DRA for Clinton CF; DOCCS Office of Diversity Management; and Martin Blair/PEF.  Plaintiff never receives a response to her request for reasonable accommodations

90. On December 18, 2015, Plaintiff sends an updated physical capabilities form completed by her physician and a letter again requesting permission to return to work and reasonable accommodations to DSA Keysor.

91. On January 25, 2016, Plaintiff receives a phone call from Martin Blair/PEF informing me DOCCS has informed him they have issued an Notice of Discipline against Plaintiff seeking her termination.

92. On January 28, 2016 Plaintiff receives Defendant's Notice of Discipline sent to her via Certified Mail from the US Post Office.

93. On April 21, 2016 Plaintiff receives a Letter from Debbie Keysor signed by Jill Besaw advising her *"we intend to process your termination effective 5/26/16, beginning of business under the provisions of Section 73 of the Civil Service Law. This particular section of the law provides for the separation of an employee once their absence has exceeded one year for a disabling medical condition."*

94. On April 28, 2016, Plaintiff provides DOCCS Director of Human Resources a letter in response to the Notice of Section 73 termination.  In the letter, Plaintiff also asks the DOCCS Director of Human Resources to address the discrimination, harassment and retaliation, institute corrective measures, and Plaintiff again requests to be allowed to return to work and reasonable accommodations.


95. On May 4, 2016, Plaintiff receives a copy of her DOCCS Personnel File in response to my written request.  Plaintiff's Personnel File contains documentation and correspondence regarding her disability and her requests for reasonable accommodations.  DOCCS violated Plaintiff's confidentiality and

HIPPA by placing this information in her DOCCS Personnel file instead of her secure DOCCS Medical file.

96. On May 5, 2016, Plaintiff sends a 2nd Letter to Darren Ayotte, DOCCS Director of Human Resources.  Plaintiff inquires about his review of her written objections.  Plaintiff also notes Defendant's April 21, 2015 Notice of Section 73 termination letter states she is entitled to reasonable accommodations, and she informs Defendant she has been seeking reasonable accommodations.

97. On May 6, 2016, Plaintiff's Union, PEF, sends a letter to Darren Ayotte stating she objects to her termination and exercises her right to a full post termination hearing under Section 73, if so needed. PEF's letter further notes an object to her termination based upon the fact she was not absent for a consecutive year and can testify that I am medically fit to return to duty immediately.

98.  On June 13, 2016, Plaintiff sends her 5th letter via fax and certified mail RRR to Darren Ayotte, DOCCS Director of Human Resources. I request clarification and confirmation to ensure I correctly understand DOCCS May 26, 2016 letter.  "*I have been informed by you and Clinton CF that I will need to return to full duty, without restrictions, and I must be able to return with the reasonable accommodations that I was granted on June 26, 2015.*

99. On July 8, 2016 Plaintiff receives a letter from DOCCS dated July 6, 2016 informing her she was terminated on June 27, 2016 under the provisions of Section 73 of the Civil Service Law.

100.   On June 26, 2017, Plaintiff goes to Employee Health Services in person to

drop off a reinstatement exam request.

101.   On July 10, 2017, Plaintiff attends an Appeal Hearing for her Section 73

Termination.   She appears without counsel and DOCCS presents their case on

this date.  For the first time, DOCCS states that Plaintiff was placed on leave

under NYCRR 21.3 and after being placed on leave for one year under 21.3, they

could terminate Plaintiff under Section 73. Plaintiff checked with PEF, they did

not have any information in Plaintiff's file and no record Defendant ever

informed PEF or Plaintiff that she was being placed on leave pursuant to

NYCRR 21.3.

102.    Plaintiff receives a letter dated August 1, 2017 from Richard A. Ciulla, MD,
Medical Director of EHS.  *"...Such evaluations are available provided that the
disability which prevented you from reasonably performing the essential duties
of your former position has resolved and that you are presently capable of
performing all of the essential duties of your former position.  ....need you to
provide this office with information from Dr. Heath indicating what your
functional limitations are and what accommodations are required*."

103.   On August 21, 2017, Plaintiff attends the hearing represented by her

Attorney Patrick Sorsby.  On cross examination, the witness from DOCCS

Department of Personnel testifies DOCCS changed Plaintiff's job duties.

104.   On September 18, 2017, the Section 73 Appeal Hearing concluded and the

attorneys have agreed to submit Memorandums of Law.

105.    Plaintiff provided the medical document multiples following the request. This documentation from her Doctor indicated that she was fit to perform the essential functions of her job provided that she was given a reasonable accommodation

### AS AND FOR A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (FAILURE TO ACCOMMODATE UNDER FEDERAL AND STATE LAW)

106.    The allegation in paragraphs "1" through "105" are incorporated herein as if set forth in full.

107.    Starting in or about April 2014, the Defendant unfortunately denied reasonable accommodations to the Plaintiff and subsequently thereafter continued a pattern of denying Plaintiff's many requested and required accommodations.

108.    That the Defendants are subject to both state and federal laws prohibiting discrimination based on a disability.

109.    All requests for reasonable accommodations came with supporting medical documentation, again placing the Defendant on notice of the Plaintiffs medical condition(s).

110.    Despite being put on notice of Plaintiffs Disability and receiving multiple requests for accommodations the Defendant unlawfully and intentionally chose to violate Plaintiff Federal and State Civil Rights.

111.    That the defendants discriminated against the Plaintiff based on her disability because they had received several accommodation requests, were on notice of her disability, there was a record of her disability and the Defendant never engaged in interactive process to determine a suitable accommodation for her.

112.    That the defendants discriminated against the Plaintiff based on her disability because they had received several accommodation requests, were on notice of her disability, there was a record of her disability and the Plaintiffs several accommodation requests were nonetheless denied by the Defendant.

113.    That the defendants discriminated against the Plaintiff based on her disability because they had received several accommodation requests, were on notice of her disability, there was a record of her disability and the Defendant with no legitimate nondiscriminatory reason took the tangible employment action of giving the Plaintiff a negative performance review.

## AS AND FOR A SECOND CAUSE OF ACTION
## (DISPARITE TREATMENT UNDER FEDERAL AND NY LAW)

114.  The allegation in paragraphs "106" through "113" are incorporated herein as if set forth in full.

115. As is alleged throughout the complaint the Plaintiff is in a protected class (disable persons) and the Defendants treated similarly situated employees outside her class differently when fro example it gave other employees extra time to complete tasks, reduction in nonessential duties, light duty assignments to name a few and as better demonstrated in the complaint.

## AS AND FOR A THIRD CAUSE OF ACTION
## (RETALIATION UNDER FEDERAL AND NY LAW

116. The allegation in paragraphs "114" through "115" are incorporated herein as if set forth in full.

117. As alleged throughout this complaint the Plaintiff engaged in several activities protected by State and Federal Law for which was retaliated against.

118. As alleged in this complaint the protected activities that Plaintiff engaged in include but are not limited to the following seeking the protections of the FMLA, requesting an

accommodation for her disability, and apposing practices prohibited by the FMLA, Title VII, the ADA, and NY human rights law.

119. As alleged in this complaint the Defendant retaliated against the Plaintiff in the following ways: 1) After Plaintiff first sought an accommodation Defendant modified Plaintiffs job duties in a significant way by among other things assigning two additional programs the Plaintiffs work load, 2) by unnecessarily increasing the Plaintiffs case load by officially listing inmates as active participants in closely scrutinized 6 month program (previously management provided an accommodation of time before this was entered), 3) Defendant censured Plaintiff allegedly because her SOCTP program ran longer than 18 months 4) failed to promote the plaintiff and termination of the plaintiff.

## AS AND FOR A FOURTH CAUSE OF ACTION
## (DISRIMINATORY TERMINATION)

120. The allegation in paragraphs "116" through "119" are incorporated herein as if set forth in full.

121. As alleged throughout the complaint has a disability as defined by the ADA and NYHRL because among reasons she was diagnosed with a disability and was regarded by her employer as one with a disability.

122. The plaintiff was qualified to perform the essential functions of the job with an accommodation.

123. The Plaintiff was terminated by the Defendant under circumstances that give rise to an inference of discrimination and the Defendant had no legitimate nondiscriminatory reason to terminate the Plaintiff.

## AS AND FOR A FIFTH CAUSE OF ACTION
## (HOSTILE WORK ENVIRONMENT)

124. The allegation in paragraphs "120" through "123" are incorporated herein as if set forth in full.

125. That the Defendant's agents engaged in conduct of a verbal or physical nature that was sufficiently severe or pervasive such that the Plaintiffs terms of employment were altered and all with discriminatory animus.

## AS AND FOR A SIXTH CAUSE OF ACTION
## (PENDENT STATE CLAIMS)

126. The allegation in paragraphs "124" through "125" are incorporated herein as if set forth in full.

127. That the conduct of the Defendant's employees as alleged in throughout the complaint violate New York Human Rights Law§§292 and 296 et seq.

128. That as the Defendant's conduct is in violation of §§292 and 296 et seq. the Plaintiff is entitled to compensatory and punitive damages in an amount to be proven at trial.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## (VIOLATIONS OF FMLA)

129. The allegation in paragraphs "126" through "128" are incorporated herein as if set forth in full.

130. That as alleged throughout this complaint the conduct of the Defendant various agents violated the Family Medical Leave Act by among other things failing to reinstate her upon her return from FMLA, failure to notify of her rights under FMLA and by taking adverse actions against her for taking FMLA.

## AS AND FOR A EIGTH CAUSE OF ACTION
## (VIOLATIONS OF GINA)

131. The allegation in paragraphs "129" through "130" are incorporated herein as if set forth in full.

132. That the Defendants request For Plaintiffs Entire Medical Record Would Have Resulted In The Disclosure Of Family Medical History that would include genetic information and this is violation of the Genetic Nondiscrimination Act of 2008.

**WHEREFORE**, plaintiff respectfully requests that this court enter a judgment:

1.  Declaring that the acts and practices complained of herein are in violation of the Americans With Disabilities Act, 42 U.S.C. §§12101, 12117 and 42 U.S.C. §1981a. and the New York Human Rights Law ("NYHRL"), N.Y. Exec. Law § 290 et seq. for employment discrimination based on a Disability. Title VII of the Civil Rights Act of 1964 and constitute the basis for awarding back pay with interest, compensatory damages, other lost benefits, and such other further relief as to this Court seems just and proper.

2.  Award to the Plaintiff Marilyn Smith compensatory damages in each cause of action in an amount to be proven at trial.

3.  Award to the Plaintiff exemplary damages in each cause of action in an amount to be proven at trial.

4.  Award plaintiff the costs, disbursements and attorney's fees for the prosecution of this matter along with such other and further relief as the Court may deem just and proper.

5.  Award damages under state and federal law in such way as to maximize the Plaintiffs possible award. In the Second Circuit, various courts at their discretion have awarded all punitive damages under federal law and compensatory damages under state law. Under New York State law there is no cap on compensatory damages in sexual discrimination cases but punitive damages are not recoverable.

DATED: October 13, 2017                 LAW OFFICE OF PATRICK SORSBY PLLC

By_____S/_____

Patrick Sorsby
Bar Roll No.: 517840
Attorney for Plaintiff
1568 Central Avenue
Albany, New York 12205
Phone: (518) 456-4529
E-mail: sorsbylaw@gmail.com